**Page 1**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CARNEAL ROBINSON,

    Plaintiff,

vs.     No. 2015 CV 06752

CALUMET CITY, a municipal corporation, JOHN DOE OFFICERS, et al.,

    Defendants.

The deposition of CARNEAL B. ROBINSON, called by the Defendant for examination, taken pursuant to notice and pursuant to the Federal Rules of Civil Procedure for the United States District Courts pertaining to the taking of depositions, taken before Maureen K. Nagle, Certified Shorthand Reporter and Notary Public, at 3318 W. 95th Street, Evergreen Park, Illinois, commencing at 2:30 p.m., on the 14th day of September, 2016.

MARIE L. ROGERS, CSR, (708)430-2520

**Page 2**

APPEARANCES:

DVORAK LAW OFFICES, LLC
BY: MR. ADRIAN BLEIFUSS PRADOS
900 W. Jackson Boulevard
Suite 5W
Chicago, Illinois 60607
Phone: (773)641-4667
E-Mail: Ableifuss@gmail.com
    On behalf of the Plaintiff;

ODELSON & STERK, LTD.
BY: MR. RICHARD F. BRUEN
3318 West 95th Street
Evergreen Park, Illinois 60805
Phone: (708) 424-5678
E-Mail: rbruen@odelsonsterk.com
    On behalf of Defendants Calumet City and John Doe Officers;

ANCEL, GLINK, DIAMOND, BUSH, DiCIANNI & KRAFTHEFER
BY: MR. THOMAS G. DiCIANNI
140 S. Dearborn Street
Chicago, Illinois 60603
Phone: (312)782-7606
E-Mail: Tdicianni@ancelglink.com
    On behalf of Defendant Village of Burnham and Investigator Daley;

PATTON & RYAN, LLC
BY: MS. NATALIE ESCHBACH
330 N. Wabash Avenue
Suite 3800
Chicago, Illinois 60611
Phone: (312)261-5198
E-Mail: neschbach@pattonryan.com
    On behalf of Defendant Village of Posen and Officer Damato;

MARIE L. ROGERS, CSR, (708)430-2520

**Page 3**

OFFICE OF THE ILLINOIS ATTORNEY GENERAL
BY: MS. SHIRLEY R. CALLOWAY
100 W. Randolph Street
Chicago, Illinois 60601
Phone: (312)814-5581
E-Mail: Scalloway@atg.state.il.us
    On behalf of Defendants Gainer, Garcia, and Foster;

ILLINOIS STATE POLICE LEGAL OFFICE
BY: MS. MARNI M. MALOWITZ
1941 W. Roosevelt Road
Chicago, Illinois 60608
Phone: (312)433-8000
E-Mail: Marni_malowitz@isp.state.il.us
    On behalf of Defendants Gainer, Garcia, and Foster;

SMITH AMUNDSEN
BY: MS. KAY WEILER
3815 E. Main Street
Suite A-1
St. Charles, Illinois 60174
Phone: (630)587-7910
E-Mail: Kweiler@salawus.com
    On behalf of the Deponent.

\* \* \* \* \* \*

MARIE L. ROGERS, CSR, (708)430-2520

**Page 4**

I N D E X

| WITNESS: | PAGE |
|---|---|
| CARNEAL ROBINSON | |
| Direct Examination by Mr. Bruen | 6 |
| Direct Examination by Mr. DiCianni | 144 |
| Direct Examination by Ms. Eschbach | 149 |
| Direct Examination by Ms. Calloway | 151 |
| Cross-Examination by Mr. Prados | 156 |
| Redirect Examination by Mr. Bruen | 157 |
| Redirect Examination by Mr. DiCianni | 161 |

EXHIBITS:

| | |
|---|---|
| C. Robinson Deposition Exhibit No. 1 ID | 14 |
| C. Robinson Deposition Exhibit No. 2 ID | 33 |
| C. Robinson Deposition Exhibit No. 3 ID | 48 |

\* \* \* \* \*

MARIE L. ROGERS, CSR, (708)430-2520

**EXHIBIT B**

Page 85

1  Q.  Did you make any attempt to call 911 after
2  seeing the man lying on the basement floor?
3  A.  No.
4  Q.  After you got out of the house, the paramedics
5  were there, you are saying, for sure.  Do you remember
6  seeing an ambulance or a fire truck outside?
7  A.  Ambulance, yeah.  I didn't remember seeing a
8  fire truck.
9  Q.  Then you saw some police outside.
10      Was there tape outside by the time you got
11 outside?
12 A.  Not yet.
13 Q.  Describe what you did when you got outside.
14 Go on with that.
15 A.  Went across the street and just stood there and
16 watched.
17 Q.  Did you attempt to tell any of the officers or
18 paramedics that there was a person in your basement who
19 had been shot or hurt?
20 A.  No.  I was trying to figure out what happened
21 to get to the bottom but nobody knew nothing.
22 Q.  Like how did you try and get to the bottom of
23 it?
24 A.  If it was somebody I knew, I would ask them

Page 86

1  what happened; and all my people didn't know what
2  happened.
3  Q.  Did anybody mention there had been a shooting?
4  A.  Yeah, some people said there was somebody
5  shooting like that.  They weren't precise about it or
6  where it was at or nothing.  Didn't nobody really know
7  nothing.  It was kind of in the air.  I found out a lot
8  of information from the police when they started
9  questioning me.  They told me that seven people got
10 shot.  I couldn't believe it.  I heard one or two gun
11 shots is what I heard.
12 Q.  You didn't observe any injured people outside
13 the house when you got out?
14 A.  No, I didn't observe that.
15 Q.  You didn't see anybody sitting up against a
16 car bleeding or anybody that appeared injured?
17 A.  No.  Was there somebody on the grass?  No.  Was
18 there somebody in the grass -- No, there was nobody
19 there.  Everybody was gone -- not gone but everybody
20 looked okay.  Everybody went in the ambulance truck or
21 they went home or I don't know.  I didn't see anybody
22 bleeding.  I would remember that.
23 Q.  How long was it from when you left your home
24 till when you walked across the street to observe?  How

Page 87

1  long was that?  Did you go right across the street?
2  A.  Yeah.
3  Q.  Pretty much right away?
4  A.  It was slow motion.
5  Q.  So you didn't walk around and see if anybody
6  had been injured or --
7  A.  No, because you got the driveway right there
8  and grass over there.  There is no way to hide.  You can
9  see real quick.  Once you come off the steps, you can
10 turn your head and look.  I had dogs in the yard, so no.
11 Q.  You went across the street and you stood
12 there.  How long were you standing there?
13 A.  I don't know.  I don't know.  It was some time.
14 Q.  Did you call your mother?
15 A.  Yeah.  She told you I called her.
16 Q.  Correct.  Why don't you tell me about that.
17 Why did you decide to call your mother?
18 A.  That's the person I tell everything to.
19 Q.  Did you tell her to come to the house?
20 A.  Yeah.
21 Q.  What did you tell her on the phone?
22 A.  I can't remember what I exactly told her; but I
23 told her, you know -- I'm always vague on the phone with
24 my mom because she gets overexcited so you can't tell

Page 88

1  her too much.
2  Q.  Do you know what time this was?
3  A.  No, I didn't keep track of the time that whole
4  night.
5  Q.  It's after midnight, correct?
6  A.  Oh, yeah.
7  Q.  You called her and said come over and you
8  didn't give her any details?
9  A.  No, vaguely.  I said something bad happened and
10 stuff.  I didn't tell her what exactly happened -- what
11 I thought exactly happened because she might have been
12 hysterical.
13 Q.  So you called her, and then you stayed across
14 the street?
15 A.  Yes.
16 Q.  Did you interact with anybody between -- from
17 when you called your mother until when your mother
18 arrived?
19 A.  I know me and Shafeeq, that was it.
20 Q.  Did Shafeeq stay across the street with you
21 the whole time?
22 A.  Yeah.
23 Q.  Did any police officers approach you to talk
24 to you?

### Page 129

1  Q. If you looked on Ebay, you did a comparable
2  sample, you didn't print any of that?
3  A. No.
4  Q. Carneal, did you make a claim to insurance for
5  the items that were broken or stolen?
6  A. I attempted to, but I couldn't even get that
7  far. They denied me before I even got a chance to, you
8  know, do any pictures or things of that nature because
9  they said something about a government body or somebody
10 uncovered it. I don't know what the specifics on it
11 are, but they denied it.
12 Q. I have a couple more questions on the coins or
13 the currency you identified in Paragraph 12.
14     Do you remember where you bought these
15 items?
16 A. Various people. I can go to flea markets. I
17 might run into somebody off the street. Just anything.
18 I stopped doing it after they came up missing. It's not
19 worth it if I'm not -- if I can't keep them my whole
20 lifetime.
21 Q. Over what period of time did you acquire --
22 A. I've been doing this since I was a teenager,
23 maybe even younger than that, because I get them from my
24 grandmother, family members give me coins to keep.

### Page 130

1  Q. You don't know how much you paid; you don't
2  have any records of that?
3  A. No. I don't keep records of stuff like that.
4  Q. No appraisals beyond your Ebay research?
5  A. No.
6  Q. You are very specific too. I want to get to
7  this. You say 399 Walking Liberty silver half dollars,
8  81 Susan B. Anthony dollars. You are very specific.
9     Did you keep a log of these items?
10 A. I counted them and wrote them on a sheet of
11 paper I had next to the coins. That was stupid because
12 they have that too.
13 Q. Let's go back to that. You kept the number of
14 coins on one sheet of paper?
15 A. Yeah.
16 Q. That was in the safe?
17 A. Yeah. At one point I did take a picture of it,
18 but I lost the picture of it because it was on my old
19 iPhone 5 that they kept and gave back to me and erased
20 everything out of it.
21 Q. When you saw the safe when you came back to
22 the house after you were detained, the safe was open and
23 your coins were gone; is that your testimony?
24 A. Right.

### Page 131

1  Q. What about the sheet of paper with the numbers
2  on it, that was gone too?
3  A. Yeah.
4  Q. How did you come up with these numbers?
5  A. Because I had them on my phone.
6  Q. Which phone did you have it in?
7  A. I had the 5C they took away. I had to get
8  another phone because they didn't give me my phone back
9  until like four months later. I got another phone, and
10 it popped up in my phone after I got it back. Half my
11 data popped up. The iPhone, they don't give you all
12 your information back.
13 Q. Do you still have that phone where this info
14 popped up?
15 A. Yeah, I still got the phone.
16 Q. We would ask to preserve the phone so we can
17 look at it.
18     When was the last time you saw the coins?
19 When was the last time you looked inside the safe prior
20 to the party?
21 A. It was a little time before that. I don't know
22 exactly how long ago it was.
23 Q. Was it the day of the party?
24 A. No.

### Page 132

1  Q. Was it a week before?
2  A. I can't remember. I don't know. I don't know.
3  Q. On December 21, 2014, you did not look inside
4  the safe; is that safe to say?
5  A. No. The only thing I did was I made sure it
6  was -- wasn't tampered with. When I opened the closet,
7  I shook the handle.
8  Q. You can't tell me when the last time you saw
9  your coins prior to noticing -- Your currency that's
10 identified in Exhibit 12, as well as anything else in
11 your safe, your big safe, you don't know the last time
12 you saw that prior to the party; is that right?
13 A. No, I can't remember that.
14 Q. Tell us about your insurance claim that you
15 made.
16 A. The one when I got denied?
17 Q. Yes.
18 A. They gave a reason; and when I asked the
19 lawyer, they said that's one of their policies,
20 something about a government -- What do you call it? A
21 government body -- I guess basically saying if they
22 search your house and stuff comes up missing, that they
23 are not liable.
24 Q. Let's go back to the beginning.

MARIE L. ROGERS, CSR, (708)430-2520

157

1  before the incident, of course. I don't know.
2      Q.   You testified earlier about the period during
3  which you were in the lockup, in the custody of the
4  Calumet City Police Department.
5           You were relieved to know that your mother
6  was by the house monitoring it, correct?
7      A.   Correct.
8      Q.   But you were still -- you were deprived of
9  your liberty for more than 48 hours in that period?
10          MR. BRUEN: I'm going to object to the form of
11 the question. It's a legal conclusion.
12 BY MR. PRADOS:
13     Q.   You weren't free to leave for more than 48
14 hours, right?
15     A.   Oh, yeah, I wasn't free to leave.
16     Q.   By the time that you and Shafeeq left the
17 house, who else was inside the building?
18     A.   Nobody but the paramedic.
19          MR. PRADOS: I have no other questions.
20          MR. BRUEN: I just have a few quick follow-ups,
21 Carneal, and we'll get you out of here.
22                 REDIRECT EXAMINATION
23 BY MR. BRUEN:
24     Q.   You mentioned when you were being examined
                MARIE L. ROGERS, CSR, (708)430-2520

158

1  just now, you talked about the car -- that the street
2  was jammed with cars; is that right?
3      A.   Yeah.
4      Q.   This is when you walked out, you saw the
5  street. Was the street full of cars?
6      A.   Yes, as far as the normal cars parked and the
7  police cars and ambulance.
8      Q.   Were there any parking spaces available that
9  you could see or was the street pretty full?
10     A.   It was full.
11     Q.   Then you said your -- your testimony was that
12 your mom called you at some point -- you called your mom
13 and she came?
14     A.   Right.
15     Q.   Did you see her car or speak with her before
16 you went to the police station?
17     A.   Yeah, I had to. She took me there.
18     Q.   She did. Where was she when you went and saw
19 her?
20     A.   She was somewhere on the block. I can't
21 remember exactly where she was at.
22     Q.   She never got out of her car and tried to come
23 and talk to you?
24     A.   No, she was scared.
                MARIE L. ROGERS, CSR, (708)430-2520

159

1      Q.   You stated that your mom had taken the
2  pictures of your coins that your attorney had pointed
3  out?
4      A.   Right.
5      Q.   Why did she do that?
6      A.   That's what she does. She takes pictures of
7  things, keeps records of things.
8      Q.   How did you get the pictures that are in
9  Exhibit No, -- I'm sorry, these exhibits are running
10 together at this point -- your mother's Exhibit No. 3?
11 How did she get those pictures to you? Did she
12 e-mail --
13     A.   She sent them by text. We didn't do e-mail.
14     Q.   Do you have the phone where you received those
15 pictures?
16     A.   No.
17     Q.   What did you do with it?
18     A.   I don't know.
19     Q.   Well, you are looking at the first page --
20 Your attorney asked you, it says mom on the corner --
21     A.   I had the 5C. I sold that phone when I got it
22 back from police.
23     Q.   So your testimony is that you received the
24 pictures in your mother's Exhibit 3 and then you sold
                MARIE L. ROGERS, CSR, (708)430-2520

160

1  your phone; is that your testimony?
2      A.   Yeah. I got a new phone so there wasn't no
3  sense -- I don't keep old phones.
4      Q.   Who did you sell the phone to and when?
5      A.   It was a random person.
6      Q.   What do you mean by random, somebody on the
7  street or a --
8      A.   Basically somebody told me somebody is looking
9  for an Apple phone, and I told them how much it cost,
10 and they bought it.
11     Q.   So you have no electronic evidence of when
12 those pictures were taken; is that right?
13     A.   No, I don't have any electronic evidence of
14 when these pictures were taken.
15          You mean like with the phone?
16     Q.   Yes.
17     A.   I didn't take the pictures, so why would I have
18 that?
19     Q.   Your mother took the pictures?
20     A.   Right.
21     Q.   Can you tell from the tops of Exhibit No. --
22 some of the pictures in Exhibit No. 3, your mother's
23 Exhibit No. 3, what phone you received those on?
24     A.   What phone? What phone she used?
                MARIE L. ROGERS, CSR, (708)430-2520